UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

STEPHEN WEBSTER BENTLEY,

          *Petitioner,*

v.                                Case No. 3:22-cv-1431-JEP-LLL

SECRETARY OF THE FLORIDA
DEPARTMENT OF CORRECTIONS,

          *Respondent.*

_____/

## **ORDER**

### **I. Status**

Petitioner, Stephen Webster Bentley, is proceeding on a petition for writ of habeas corpus under 28 U.S.C. § 2254 (Doc. 1). He challenges a 2019 state court (Duval County, Florida) judgment of conviction for which he is serving a life sentence. *See* Doc. 1 at 1. Respondents filed a response (Doc. 9) with exhibits (Docs. 9-1 to 9-12).[1] Petitioner filed a reply (Doc. 10) with exhibits (Docs. 10-2 to 10-5). This action is ripe for review.[2]

---

[1] When citing pleadings and exhibits, the Court will use the page numbers assigned by this Court's electronic docketing system.

[2] In a habeas corpus proceeding, the burden is on the petitioner to establish the need for a federal evidentiary hearing. *See Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1060 (11th Cir. 2011). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007);

## II. Governing Legal Principles

## A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. *Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F.3d 600, 642 (11th Cir. 2016) (explaining AEDPA deference), *abrogation in part on other grounds recognized by Smith v. Comm'r, Ala. Dep't of Corr.*, 67 F.4th 1335, 1348 (11th Cir. 2023). "The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." *Id.* (quoting *Greene v. Fisher*, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. *Marshall v. Sec'y Fla. Dep't of Corr.*, 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. *Harrington v.*

*Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1318-19 (11th Cir. 2016). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro*, 550 U.S. at 474. The Court finds that "further factual development" is unnecessary. *Turner v. Crosby*, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

2

*Richter*, 562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 584 U.S. 122, 125–26 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." *Id.* § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*,

3

562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. *See, e.g., Mitchell v. Esparza*, 540 U.S. 12, 18 (2003); *Lockyer*, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); *Williams v. Taylor*, 529 U.S. 362, 410 (2000) ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law.").

*Bishop v. Warden, GDCP*, 726 F.3d 1243, 1253–54 (11th Cir. 2013) (parallel citations omitted).

"AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). "Federal courts may grant habeas relief only when a state court blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no possibility fairminded jurists could disagree.'" *Tharpe v. Warden*, 834 F.3d 1323, 1337–38 (11th Cir. 2016) (explaining in detail the parameters "for limited federal review" of state court decisions under § 2254(d)(1) and (d)(2)). This standard is "meant to be" a "difficult" one to meet. *Richter*, 562 U.S. at 102. Thus, to the extent that the petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under § 2254(d). Also, deferential review under § 2254(d)

4

generally is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (stating the language in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made").

## B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a federal habeas action under § 2254, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. *Castille v. Peoples*, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also Pope v. Rich*, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that *Boerckel* applies to the state collateral review process as well as the direct appeal process").

In addressing exhaustion, the United States Supreme Court explained:

Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1),

5

thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. *Duncan*, 513 U.S. at 365–66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

*Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (parallel citations omitted).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default, which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. *See, e.g.*, *Coleman*, 501 U.S. at 747–48; *Wainwright v. Sykes*, 433 U.S. 72, 84–85 (1977). A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. *See, e.g., Walker v. Martin*, 131 S. Ct. 1120, 1127–28 (2011); *Beard v. Kindler*, 130 S. Ct. 612, 617–18 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and

> prejudice from a violation of federal law. *See Coleman*, 501 U.S. at 750.

*Martinez v. Ryan*, 566 U.S. 1, 9–10 (2012) (parallel citations omitted). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default or (2) a fundamental miscarriage of justice. *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010). For a petitioner to establish cause and prejudice,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." *McCoy v. Newsome*, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting [*Murray v.*] *Carrier*, 477 U.S. [478,] 488 [(1986)]). Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." *Id.* at 1261 (quoting *Carrier*, 477 U.S. at 494).

*Wright v. Hopper*, 169 F.3d 695, 706 (11th Cir. 1999) (parallel citation omitted).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Carrier*, 477 U.S. at 496. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001).

*Ward*, 592 F.3d at 1157 (parallel citation omitted). "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. *Schlup*, 513 U.S. at 324.

### C. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam) (citing *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Strickland v. Washington*,

8

466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that (1) counsel's performance was outside the wide range of reasonable, professional assistance, and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. *Strickland*, 466 U.S. at 687.

There is no "iron-clad rule requiring a court to tackle one prong of the *Strickland* test before the other."  *Ward*, 592 F.3d at 1163. Since both prongs of the two-part *Strickland* test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." *Id.* (citing *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in *Strickland*, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which . . . will often be so, that course should be followed." 466 U.S. at 697.

Further, "[t]he question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (internal quotation marks omitted). In other words, "[i]n addition to the deference to

counsel's performance mandated by *Strickland*, the AEDPA adds another layer of deference—this one to a state court's decision—when [federal courts] are considering whether to grant federal habeas relief from a state court's decision." *Rutherford v. Crosby*, 385 F.3d 1300, 1309 (11th Cir. 2004).

If there is "any reasonable argument that counsel satisfied *Strickland*'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. *Richter*, 562 U.S. at 105. As such, "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting *Strickland*, 466 U.S. at 689).

### III. Facts & Procedural History

On April 15, 2019, a jury found Petitioner guilty of second-degree murder as charged in the Information for the 2014 death of his (short-term) roommate. *See* Doc. 9-2 at 38–39, 975; *see also* Doc. 9-1 at 296. The victim died from multiple stab wounds caused by a sharp weapon prosecutors suspected was a machete given the extent of the victim's wounds, including a "traumatic amputation" of one extremity. *See* Doc. 9-2 at 37, 757, 763–64, 773, 779–80, 784. At trial, the state presented mostly circumstantial evidence to support its

case against Petitioner, in the form of the following: witness testimony by other residents or visitors of the apartment complex (McClain, Oneal, and Bethea), who said they stopped by the victim's apartment to purchase cigarettes from him, but Petitioner answered the door acting and looking suspicious;[3] testimony of a crime scene detective, who reported that a machete sleeve was found under the couch in the victim's apartment; testimony of witness Oneal, who said she saw a machete in Petitioner's vehicle a couple of months before the murder and saw Petitioner leave the parking lot quickly—with a duffel bag—sometime after he answered the victim's apartment door; testimony of witness McNeil, who said that Petitioner borrowed a key to the victim's apartment from him on the day of the murder, and when Petitioner returned the key, he had a cloth wrapped around his right hand with blood on it; testimony of Petitioner's former boss, who said Petitioner quit his job the morning of the murder abruptly and without notice; surveillance footage showing Petitioner left his job a few minutes before 10:00 a.m.; testimony of Petitioner's ex-girlfriend and her mother, who both said Petitioner arrived at their house near Tampa around dinner time on the day of the murder and slept in his car for the first couple of nights; testimony of the clubhouse manager of

---

[3] The victim would have visitors throughout the day because he operated a "bootleg" convenience store out of his apartment, selling mostly cigarettes and beer. *See, e.g.*, Doc. 9-2 at 116–18.

11

Petitioner's ex-girlfriend's subdivision, who noticed Petitioner was wearing what "looked like a food service glove" on his right hand; surveillance footage from Petitioner's ex-girlfriend's subdivision that showed Petitioner wearing a plastic glove on his right hand with what appeared to be bandaging underneath; testimony of a homicide detective, who said Petitioner had "fresh skin growth" on his knuckles when he was arrested; and testimony of a crime scene detective who processed a first-aid kit found in Petitioner's vehicle when he was arrested, which was missing one clear glove similar to the one Petitioner was seen wearing at his ex-girlfriend's subdivision. *See generally id.*

Witnesses who testified to seeing Petitioner at the victim's apartment complex gave somewhat contradictory testimony (when compared to each other and surveillance evidence) about the time of day they saw or interacted with Petitioner on the day of the murder, and the state could not pinpoint with any precision the time of the victim's death. Although circumstantial evidence of the timeline was vague, the state also presented direct physical evidence connecting Petitioner to the murder: the victim's blood was on a pair of sunglasses recovered from a trashcan in the victim's apartment, and those sunglasses matched a pair Petitioner was wearing earlier that day, as captured by surveillance cameras; the victim's blood also was found in Petitioner's car, on toiletry bags inside Petitioner's duffel bag, and on a piece of paper that also

had Petitioner's fingerprint on it; Petitioner's blood was found inside the victim's apartment and on the duffel bag he left town with; and an inmate who was in a holding cell with Petitioner after Petitioner's arrest testified that Petitioner told him he (Petitioner) "hacked [a] faggot up"[4] with a tool he used to cut tile, constructed an alibi by swiping his ID card at his gym around the time of the murder, and threw the murder weapon into the St. Johns River on his way out of town. *See generally id.; see also* Doc. 9-1 at 298 (exhibit list).

At Petitioner's sentencing hearing, the trial court denied Petitioner's motion for a new trial and sentenced him to life. *See* Doc. 9-1 at 402, 413–16. Judgment was entered on May 15, 2019. *Id.* at 366.

On direct appeal, Petitioner's appointed appellate counsel filed an *Anders*[5] brief identifying three judicial acts to be reviewed and requesting that Petitioner be permitted an opportunity to file a *pro se* brief. *See* Doc. 9-3 at 34, 38. In his *pro se* brief, Petitioner sought review of five issues. *See* Doc. 9-4 at 34. The First District Court of Appeal ("First DCA") per curiam affirmed Petitioner's judgment and sentence without a written opinion. *See* Doc. 9-6 at 3. The mandate issued on April 19, 2021. *Id.* at 2. Petitioner filed a *pro se*

---

[4] There was testimony that the victim was homosexual or bisexual and had HIV, and other apartment residents presumed the victim and Petitioner were in a sexual relationship. *See* Doc. 9-2 at 119, 129, 131.

[5] *Anders v. California*, 386 U.S. 738 (1967).

motion for rehearing and request for a written opinion, which the First DCA denied. *See* Docs. 9-7, 9-8.

Proceeding *pro se* in the trial court, Petitioner sought postconviction relief by filing a motion under Florida Rule of Criminal Procedure 3.850 ("Rule 3.850 Motion"). *See* Doc. 9-9 at 6–13, 50–68. The trial court summarily denied Petitioner's Rule 3.850 Motion without an evidentiary hearing. *Id.* at 69–76. Petitioner filed a motion for rehearing, *id.* at 227, which the trial court denied, *id.* at 315. Petitioner appealed. *See* Doc. 9-10 at 3. The First DCA per curiam affirmed the trial court's denial of Petitioner's Rule 3.850 Motion without a written opinion and issued its mandate. *See* Doc. 9-12 at 2–3.

## IV. Claims & Conclusions

In his petition before this Court, Petitioner raises three grounds for relief: (1) the state's "circumstantial evidence was insufficient to sustain the conviction by failing to prove the identity element," violating the Fourteenth Amendment to the United States Constitution; (2) Petitioner was denied effective assistance of trial counsel because his lawyer failed to impeach two state witnesses, violating the Sixth Amendment to the United States Constitution; and (3) the state knowingly offered false testimony, violating *Giglio v. United States*, 405 U.S. 150 (1972). *See* Doc. 1 at 5–8.

Overall, Petitioner complains that several state witnesses were not consistent in their separate recollections of when they saw or spoke to Petitioner at the victim's apartment, and his lawyer should have more effectively highlighted the contradictory and unclear timeline. *See id.* at 16–27. According to Petitioner, undisputed evidence of Petitioner's whereabouts at verified times (surveillance footage and an electronic log from Petitioner's gym) demonstrated he could not have been inside the victim's apartment with enough time to have committed the murder. *See id.* at 18–19, 21, 27. For instance, Petitioner alleges that "[v]ideo surveillance photo's [sic] verified [Petitioner was] with Neal at two pawn shops and the gas station during the same time Regina McClain, Tasha Oneal, and Carlos Bethea testified to seeing [Petitioner] inside [the victim's] apartment …." *Id.* at 18.

### A. Ground One

Petitioner argues the state's circumstantial evidence was insufficient to sustain a conviction for second degree murder, specifically with respect to the "identity" element. *Id.* at 5. Petitioner raised a similar claim on direct appeal, and the First DCA denied the claim, affirming Petitioner's judgment and conviction without a written opinion. *See* Doc. 9-4 at 3. To the extent Petitioner raises a federal constitutional challenge in his petition, the claim is unexhausted because Petitioner did not present the federal nature of the claim

15

to the state appellate court. When briefing the issue on direct appeal, Petitioner did not state or even suggest that it was a federal claim about due process or any other federal constitutional guarantee. *Id.* at 35, 39, 41. Instead, Petitioner argued violations of state law, primarily relying on the Florida Supreme Court's ruling that "where a conviction is based wholly upon circumstantial evidence, a special standard of review applies." *Id.* at 35 (quoting *Lindsey v. State*, 14 So. 3d 211, 214 (Fla. 2009)).

Because Petitioner relied solely on state law, he did not present the federal nature of this claim to the state court. *See Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 451 (11th Cir. 2015) (holding the petitioner did not fairly present the federal nature of his claim in the state court where he argued only a state sufficiency of the evidence claim without citing any federal constitutional provisions or case law). As such, his claim is unexhausted and procedurally defaulted, and Petitioner has failed to show cause for or prejudice from this procedural default.

However, in an attempt to overcome the procedural bar, Petitioner argues a fundamental miscarriage of justice would occur if his claim were not addressed on the merits because he is actually innocent of the murder. *See* Doc. 10 at 3. In support of that argument, he contends that blood test results show he had not been exposed to HIV, which proves he was not the assailant because

16

if he in fact had cut himself while murdering a victim with HIV, he "would have been exposed to [the virus]." *See id.* But "[t]o meet this [actual innocence] standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." *Johnson*, 256 F.3d at 1171 (quoting *Schlup*, 513 U.S. at 327). In addition, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." *Calderon*, 523 U.S. at 559 (quoting *Schlup*, 513 U.S. at 324).

The record here shows that at trial but outside the presence of the jury, Petitioner requested permission to introduce his HIV test results, which showed he was "negative or nonreactive." Doc. 9-2 at 563–65. Petitioner also asked to cross-examine the medical examiner on whether HIV can be transmitted wound to wound. *Id.* at 682. After the medical examiner informally told the attorneys (for the state and defense) that he could not opine with any certainty about the likelihood of wound-to-wound transmission between the victim and Petitioner, the trial court denied the request to cross-examine the medical examiner on that topic. *Id.* at 565, 681–82, 695. The court also denied the request to admit medical records with no "sponsoring witness" to explain their relevance. *Id.* at 697. However, the court continued the trial to give the parties time to investigate the issue and obtain expert witnesses, if necessary. *Id.* at 697–99.

17

Ultimately, based on "new information" discovered during the recess, Petitioner "chose not to continue to pursue that potential part of his defense." Doc. 9-1 at 411. As the trial court summarized at Petitioner's sentencing hearing, the parties learned that "the infection rate of the victim . . . was so miniscule and low, that . . . . [there would have been] [n]o infection risk even if there had been wound to wound contact between the victim and [Petitioner]." *Id.* at 419.

Upon review of the record, the Court concludes Petitioner has failed to demonstrate a fundamental miscarriage of justice would occur if ground one were not addressed on the merits. The position Petitioner takes now—that his HIV test results prove he could not have committed the murder—is not new reliable evidence not known at the time of trial. Thus, ground one is denied.

**B. Ground Two**

Petitioner argues he was denied effective assistance of trial counsel because his lawyer did not impeach two state witnesses. *See* Doc. 1 at 7, 20–23. Petitioner explains as follows: (1) witness McNeil testified Petitioner borrowed McNeil's key to the victim's apartment at about 12:45 p.m. and returned the key about fifty-five to seventy minutes later, but undisputed evidence showed Petitioner clocked in to his gym at 1:12 p.m. and detectives were dispatched to the apartment complex as early as 1:29 p.m.; and (2)

18

witness Mazzaferro testified that Petitioner told Mazzaferro when they were in jail together that he (Petitioner) threw the "tool" he used to commit the murder in the river and clocked in at the gym before he committed the murder to "have an alibi," but no tool was recovered from the river, Petitioner clocked in at the gym at 1:12 p.m., and the first detective was dispatched to the scene at 1:29 p.m. *Id.* at 21–22.

Petitioner raised this claim in his Rule 3.850 Motion, alleging his lawyer was ineffective with respect to six "key points."[6] *See* Doc. 9-9 at 8–12, 54–59. In its order denying Petitioner's Rule 3.850 Motion, the trial court set forth the *Strickland* standard and concluded Petitioner did not demonstrate that his lawyer's failure to impeach the witnesses "would have changed the outcome of the trial." *Id.* at 69–70. The trial court addressed each point individually and found all of them meritless. *Id.* at 71–74. In addressing all points in their totality, the trial court concluded as follows:

> With respect to all of the "key points" set forth in [Petitioner's] Motion, this Court finds that they do nothing more than contradict Mr. McNeil and Mr. Mazzaferro, and at least two of the "key points" do not even rise to the level of contradiction. [Petitioner] has not stated any points of contradiction that would be relevant to proving or disproving a material fact in issue, and none that point out the witnesses' bias, corruption, or lack of competency.

---

[6] Petitioner does not raise all six "key points" in his § 2254 petition.

19

While it is possible that Mr. Mazzaferro, like Mr. McNeil, could have been contradicted on certain collateral matters, [Petitioner] has not identified any evidence to contradict the most incriminating portions of his testimony or shown that he was biased, corrupt, or otherwise incompetent. Jonathan Mazzaferro was an inmate in the Pretrial Detention Facility in Jacksonville when [Petitioner] was brought in [days after the murder]. Upon learning [Petitioner] was charged with murder, Mr. Mazzaferro suggested "maybe they won't find the gun" and "maybe you can claim self-defense," but [Petitioner] smirked; replied "no, it wasn't a gun, it was a knife;" and admitted "I hacked that faggot up." [Petitioner] said he clocked into the gym in order to have an alibi, pawned a laptop to get money for gas, and expressed concern that two women saw him leaving the victim's apartment complex, because he had blood on him. [Petitioner] also said the victim owed him money in connection with an "underground business" deal. Mr. Mazzaferro, who was serving a 10-year sentence, denied receiving any benefit in return for his testimony.

The State also presented a substantial amount of circumstantial evidence. In addition to Mr. McNeil's testimony that [Petitioner] obtained a key to the victim's apartment, witnesses including Regina McClean [sic], Tasha Neal [sic], and Carlos Bethea placed [Petitioner] in the apartment on the day of the murder and described his suspicious behavior. They indicated he was the one who answered the door, he was sweating, he cracked the door only a little so that they could not see into the apartment, and he gave vague explanations about the victim being out. These witnesses returned to the apartment soon afterward and found the victim dead. Carlos Bethea [sic[7]] also testified about seeing a machete in the back of [Petitioner's] truck about two months earlier.

Physical evidence included the presence of the victim's blood in and on [Petitioner's] duffel bag, toiletry bags, and wallet as well as [Petitioner's] fingerprint on a piece of paper with the victim's blood on it. In addition, bloodstains on the bathroom sink in the victim's apartment and on [Petitioner's] duffel bag matched

---

[7] Tasha Oneal was the witness who testified to seeing Petitioner with a machete. *See* Doc. 9-2 at 207.

20

[Petitioner's] DNA profile. There were healing injuries to [Petitioner's] hands when he was apprehended in Tampa.

This Court concludes there was sufficient evidence of [Petitioner's] guilt, and again, there is no reasonable probability that impeaching Jmarr McNeil and Jonathan Mazzaferro on the points raised in [Petitioner's] Motion would have changed the outcome of the trial.

*Id.* at 74–79 (record citations omitted).

The First DCA per curiam affirmed the trial court's denial without a written opinion. *See* Doc. 9-12 at 3. The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court finds that the state court's denial of Petitioner's claim was neither contrary to nor an unreasonable application of federal law, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. *See* 28 U.S.C. § 2254(d). Ground two is denied.

### C. Ground Three

Petitioner argues the state committed a *Giglio* violation by "making use of false testimony." *See* Doc. 1 at 8, 24. He says the state knew witnesses McClain, Oneal, and Bethea provided false testimony about the times they claimed to have seen or interacted with Petitioner at the victim's apartment complex because surveillance footage verified Petitioner was in other locations at those times. *Id.* at 26. In addition, he contends the state knew McNeil's and

21

Mazzaferro's testimonies regarding the timeline were false, because undisputed evidence showed when detectives were dispatched to the apartment complex and when Petitioner clocked in at the gym. *Id.*

Petitioner raised this claim in his *pro se* brief on direct appeal. *See* Doc. 9-4 at 3, 42–43. The First DCA per curiam affirmed Petitioner's judgment and sentence without a written opinion. *See* Doc. 9-6 at 3. As such, the Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications. In doing so, the Court notes that a *Giglio* claim requires a petitioner to show the state obtained "a conviction … by the knowing use of perjured testimony . . . [and] there is a[] reasonable likelihood that the false testimony could have affected the judgment." *Ventura v. Att'y Gen., Fla.*, 419 F.3d 1269, 1278 (11th Cir. 2005) (emphasis omitted); *see also Rodriguez v. Sec'y, Fla. Dep't of Corr.*, 756 F.3d 1277, 1302 (11th Cir. 2014) ("[T]o succeed on a *Giglio* claim, a petitioner must prove (1) that the prosecution used or failed to correct testimony that he knew or should have known was false and (2) materiality—that there is any reasonable likelihood the false testimony could have affected the judgment.").

First, Petitioner does not demonstrate any witness intentionally made a false statement regarding when they said they observed or interacted with Petitioner on the day of the murder. Importantly, the witnesses Petitioner

contends falsified their testimony acknowledged the times they provided were approximations, estimates, or guesses. *See* Doc. 9-2 at 173, 204, 249, 280. However, even if the times they testified to were wrong when compared to physical evidence (*i.e.*, surveillance footage), a witness's inability to recall a fact with specificity does not mean the witness perjured himself. *See United States v. Horner*, 853 F.3d 1201, 1206 (11th Cir. 2017) ("Perjured testimony 'must be given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory.'"); *see also United States v. Grobman*, 550 F. Supp. 3d 1286, 1305 (S.D. Fla. 2021) ("[There is no] *Giglio* violation when the witness's testimony was false due to mistake, confusion, or faulty memory.").

Second, assuming the state knew certain witnesses' time estimates could not have been correct, the state did not rely on those witnesses to establish Petitioner was inside the victim's apartment at a precise time. In other words, the precise hour and minute each witness saw Petitioner was not material to the state's case. The medical examiner testified that the victim's death could have occurred anywhere from two to thirty-six hours before his body was found. *See* Doc. 9-2 at 781. Because a specific time of death could not be established, the state did not offer the testimony of its lay witnesses to prove *when* precisely they saw Petitioner, but rather to explain what they observed when they saw

23

him (*i.e.*, behavior and appearance) and to establish that Petitioner was inside the apartment at some point during which he would have had an opportunity and time to commit the murder.

The state also did not represent or argue that the witnesses' testimonies regarding time approximations were facts the jury had to accept. Indeed, in its closing argument, the state confronted head-on the murky timeline, conceding "people's timelines varied" and urging the jurors to use their common sense in understanding that lay witnesses "would be approximating times and … would all be a little bit off." *Id.* at 865, 869. The state told the jury,

> I suspect you're going to hear some argument from the defense about the timing being off on some of the witnesses' testimony and how they recall last time they saw [the victim] alive, the times being a little different about when they went to the [victim's] door[], the timing being a little bit off about Ronald Neal's testimony and in what order [he and Petitioner] … went … to pawn shops and Gate gas stations that morning.[8]
>
> This is important to note that the State doesn't have to prove every single detail of this case beyond a reasonable doubt. What we have to prove beyond a reasonable doubt is that this defendant committed the crime and that it was a second degree murder.
>
> . . . .

---

[8] Defense counsel, in closing, did in fact argue that the state's proposed timeline did not make sense, explaining that, based on surveillance footage, the time Petitioner clocked in at his gym, distances between various locations, and the times detectives were dispatched, Petitioner would have had a window of at most twenty minutes to have murdered the victim, cleaned himself up, packed his duffel bag, and left. *See* Doc. 9-2 at 889–90.

24

> These witnesses didn't know that that morning they needed to watch their clocks and take detailed notes to be ready to testify five years later about the exact moment they saw [the victim] last alive.

*Id.* at 863–64.

Not only did the state acknowledge the unclear timeline, but it necessarily conceded certain witnesses had faulty memories when it came to the times certain events occurred by presenting to the jury evidence that contradicted some testimony: surveillance photos with time stamps; testimony from detectives about the times they were dispatched; and a log from Petitioner's gym showing when he clocked in. *See* Doc. 9-1 at 298; *see also* Doc. 9-2 at 108, 733, 831, 886–88. Considering all the evidence presented, the jury reasonably could have deduced that Petitioner had time to have murdered the victim, even if the precise time of death was unknown and even if some witnesses remembered incorrectly the times events occurred.[9]

Because there is no indication witnesses McClain, Oneal, Bethea, McNeil, or Mazzaferro intentionally lied about the timeline, and their time approximations were not material to the state's case, Petitioner does not

---

[9] Even the witness whose time spent with Petitioner was captured on and verified by surveillance cameras, Neal, remembered incorrectly the time he and Petitioner left the apartment complex together, approximating it was between 9:00 and 10:00 a.m. *See* Doc. 9-2 at 125. Surveillance footage showed Petitioner quit his job at about 10:00 a.m., and witnesses testified it takes between twenty to forty-five minutes to get to the downtown area (where the apartment complex was) from the job site. *Id.* at 220, 228, 235.

demonstrate "there was no reasonable basis for the state court to deny relief" on his *Giglio* claim. *See Richter*, 562 U.S. at 98. To that end, upon thorough review of the record and the applicable law, the Court finds that the state court's denial of Petitioner's claim was neither contrary to nor an unreasonable application of federal law, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. *See* 28 U.S.C. § 2254(d). Ground three is denied.

Accordingly, it is **ORDERED AND ADJUDGED:**

1.　　The Petition (Doc. 1) is **DENIED**, and this case is **DISMISSED with prejudice**.

2.　　The **Clerk** shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

3.　　If Petitioner appeals this dismissal, the Court denies a certificate of appealability.[10] Because this Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending

---

[10] This Court should issue a certificate of appealability only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). Upon due consideration, this Court will deny a certificate of appealability.

26

motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

**DONE AND ORDERED** in Jacksonville, Florida, on March 11, 2026.

_____
JORDAN E. PRATT
UNITED STATES DISTRICT JUDGE

Jax-6

c:
Stephen Webster Bentley
Counsel of record

27